819 So.2d 795 (2002)
Eugene N. JAMES, Appellant,
v.
Marianne M. MABIE, as Personal Representative of the Estate of Lefferts L. Mabie, Jr.; and Baron P. Smith, d/b/a Smith's Family Carpets, Appellees.
No. 1D01-2306.
District Court of Appeal of Florida, First District.
May 13, 2002.
Rehearing Denied June 26, 2002.
James M. Wilson of Wilson, Harrell, Smith, Boles & Farrington, P.A., Pensacola, for Appellant.
J. Arby Van Slyke of J. Arby Van Slyke, P.A., Pensacola, for Appellees.
PADOVANO, J.
This is an appeal from a final declaratory judgment determining the right of ownership of real property. The trial court found that the grantor of an unrecorded deed did not intend to deliver the deed to the grantee. Based on this finding, the court held that the deed was ineffective to convey title and rendered judgment in favor of the grantor's estate. We conclude that the judgment is supported by competent substantial evidence. Therefore, we affirm.
The property in controversy is a parcel of land with a warehouse situated on Pine Forest Road in Escambia County. Lefferts L. Mabie, Jr., purchased the property in 1991, and at that time he executed a note and mortgage in favor of the Peoples First Bank. On March 13, 1992, Mabie signed a warranty deed purporting to convey the property to Work Enterprises (75%) and to Eugene N. James (25%). Work and James did not assume the Peoples First mortgage. Nor did they record the deed.
On September 21, 1993, Work Enterprises leased the property to Baron Smith, who was to use the warehouse as the site of his carpet business. The lease was signed on behalf of Work Enterprises by its agent, Joe Urquhart. Smith was apparently *796 unaware of the fact that the lessor was not the record owner of the property at the time of the lease. While Smith was paying rent to Work Enterprises, Mabie executed a second mortgage on the property. Mabie and his wife, Marianne, borrowed $150,828.25, from Allen R. Levin on August 5, 1993, and they gave Levin a mortgage on the property as security for the payment of the loan.
A dispute arose between Smith and Urquhart concerning the amount of the rent and Smith eventually learned that Urquhart's company was not the record owner of the property. Smith called a county employee and discovered that the property was titled in Mabie's name. Subsequently, on October 5, 1994, Mabie wrote Smith a letter stating that he had taken over ownership of the warehouse. In his letter to Smith, Mabie wrote that he "would very much appreciate your forwarding all future lease payments directly to me." Mabie sent a copy of the letter to Urquhart who voiced no objection. Smith then began to make his rent payments to Mabie.
Smith and Mabie entered into a new agreement on December 21, 1994, in place of the lease previously executed by Work Enterprises. Mabie leased the Pine Forest Road Property to Smith for a term of five years beginning January 1, 1995, and gave Smith an option to purchase the property for $240,000 during the first twenty-four months of the lease. Mabie died in March 1996 and his wife was appointed as the personal representative of the estate. Smith did not exercise his option to purchase the property from Mabie or his estate at any time during the term of the option.
Joe Urquhart died later in 1996. The deed from Mabie to Work and James was then discovered in Urquhart's office at Work Enterprises. The president of the company said that she found the deed "thrown in" a file cabinet. On April 7, 1997, Work executed a quit claim deed conveying any interest it had in the Pine Forest Road property to Eugene James. Work owned no assets and was indebted to James. At this point, a dispute over the ownership of the property arose between Eugene James as the successor to the original deed and the estate of Lefferts Mabie.
James conceded that he gave no consideration in exchange for the March 13, 1992 deed and that he did not notify Mrs. Mabie or the estate of his interest in the property until November 1996, after the deaths of Mabie and Urquhart. He said that he did not make a claim against the Mabie estate because he did not think he was in a position to do so, given that he had only a 25 % interest in the property, and the 75% owner was not going to make a claim.
Joe Urquhart gave James a copy of the deed in 1992, but told him that it could not be recorded. James testified that he had several conversations with Urquhart about recording the deed, but Urquhart always told him "it's not time yet." In the spring of 1996, James again told Urquhart that the deed should be recorded. Urquhart remained unwilling to record the deed, but did not explain why.
Joe Elliott, a realtor, was present on March 13, 1992, when the deed was signed and he heard the conversation between Mabie and Urquhart. Elliott testified that Urquhart asked Mabie to give Work Enterprises a deed to the property. Urquhart told Mabie that he had a deal with a man in Texas regarding some oil wells and he was expecting to come into a small fortune within months after the deed was signed. According to Elliott, Urquhart was to hold the deed until Mabie's liabilities on the mortgage were satisfied.
*797 Urquhart was supposed to be making the payments on Mabie's mortgage to Peoples First, but Elliott testified that not all of the payments were going to the bank as Urquhart had promised. Elliott testified that Mabie told him there were problems with the money getting to the bank. Mabie wanted Elliott to get Urquhart to make the payments. Urquhart did not have the money, so Mabie and Elliott discussed putting the property back on the market. These discussions took place before Mabie executed the new lease with Baron Smith.
Mr. Mabie's son, Lefferts L. Mabie, III, testified that he was in contact with Mr. Urquhart on a weekly basis after his father's death, and that Mr. Urquhart never claimed he was the owner the Pine Forest Road property. Mabie's son explained that Urquhart was indebted to the estate and that he had been calling Urquhart to collect the money he owed. Likewise, Joe Elliott testified that Urquhart never asserted that he was the owner of the property.
The trial judge found that Mabie had no intent to convey the title to the property and therefore concluded that the Pine Forest Road property was an asset of the Mabie estate. This decision was based in part on Joe Elliott's testimony, which the trial judge found to be convincing and unimpeached. In this regard, the final judgment states that "[t]he court accepts Mr. Elliott's testimony that Mr. Urquhart said he wanted to have the deed for the purpose of having it to show the plaintiff." The trial judge also reasoned that Mabie would not have entered into a lease with Smith if he believed that he had conveyed the property to Work Enterprises and James, and that Urquhart, who was fully aware of the new lease, would have objected had he believed that Work Enterprises was the true owner. This, the trial judge said, was "the strongest proof" that Mabie did not intend to convey the property. Finally, the trial judge found that the fact that Urquhart never recorded the deed was evidence of the parties' understanding that the deed was not intended to convey title to the property.
We need only determine whether the record contains competent substantial evidence to support the judgment. Whether a deed has been delivered and is therefore effective to transfer ownership of real property to the grantee depends on the intent of the grantor. Smith v. Owens, 91 Fla. 995, 108 So. 891, 893 (1926); Whittimore v. Cruce, 479 So.2d 761, 763 (Fla. 1st DCA 1985). A decision regarding the intent of the grantor of a deed is one of fact, Parramore v. Parramore, 371 So.2d 123, 125 (Fla. 1st DCA 1985), and issues of fact are reviewable on appeal by the competent substantial evidence test. Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976); Clegg v. Chipola Aviation, 458 So.2d 1186, 1187 (Fla. 1st DCA 1984). It follows that we must affirm the decision of the trial court in this case if it is supported by competent substantial evidence.
The trial judge found that Mabie did not intend to deliver the deed merely by signing it and handing it over to Urquhart. This finding is supported in part by the undisputed fact that the deed was never recorded. Urquhart refrained from recording the deed, even though he was repeatedly urged by his own business associates to record it. The logical inference from this fact is that Urquhart knew he was not the true owner of the property.
This inference is also supported by circumstantial evidence in the record. For example, Urquhart made no objection when Mabie took over the lease to Smith. Mabie's execution of the new lease shows that he considered himself to be the owner of the property, despite the March 13, *798 1992 deed, and Urquhart's failure to object shows that he understood that he was not the owner. To accept the argument that the deed was intended to transfer ownership of the property, the trial court would have to conclude that Mabie leased real property he did not own, and that the true owner knowingly allowed him to do that.
In addition to the circumstantial evidence, the trial court had direct evidence that Joe Urquhart was merely holding the deed. The judge accepted Elliott's testimony that Urquhart was merely holding the deed to show James that he owned real property and that all parties understood that he was not the true owner.
Lefferts L. Mabie, Jr. and Joe Urquhart are both deceased and the record does not fully explain why they chose to enter into such an unusual real estate transaction. However, we need not approve of their motivations. The trial judge determined that Mabie did not intend to deliver the deed and there is ample evidence in the record to support that decision.
Affirmed.
ALLEN, J., CONCURS.
BENTON, J., DISSENTS WITH OPINION.
BENTON, J., dissenting.
I respectfully dissent. Fairly viewed, the evidence established that an experienced lawyer, Lefferts L. Mabie, Jr., Esq., executed a warranty deed and delivered it unconditionally to one Joseph W. Urquhart, who accepted it on behalf of the grantees, Work Enterprises, Inc. (Work), a corporation he controlled, and the appellant, Eugene N. James.
Mr. Mabie executed the deed, which was duly witnessed and notarized, on March 13, 1992. The deed purported to convey property on which a warehouse stood. At the time he delivered the deed, Mr. Mabie held title to the property the deed described, subject to a mortgage he had given, "which mortgage the grantees hereinafter expressly assume and agree to pay."
Mr. Mabie listed the sale of the warehouse property on his 1992 income tax returns. He reported the sale price as $147,492, or exactly $20,000 more than the outstanding balance on the mortgage the grantees assumed.
Promptly after execution and delivery of the deed, Work began making monthly mortgage payments to Peoples First Financial Savings & Loan Association, who held the mortgage on the property. Work made mortgage payments for about eighteen months before the property started producing income. In all, Work made mortgage payments for two years and five months, from May of 1992 through September of 1994.[1]
Baron P. Smith, d/b/a Smith's Family Carpets leased the property from Work beginning October 1, 1993. He had driven by the warehouse, where he noticed a sign bearing the name of Joe Elliott, the realtor whom the Mabie estate called as a witness below. Mr. Elliott referred Mr. Smith not to Mr. Mabie, but to Betty Sue Villar, *799 Work's president, to discuss leasing the property.
Both the lease signed September 21, 1993, and the renewal lease signed June 6, 1994, identified Work Enterprises, Inc., as the "lessor." Mr. Smith signed the original lease as lessee and Mr. Urquhart signed as the "agent" for Work Enterprises. Betty Sue Villar, President of Work Enterprises, signed the June 6, 1994 lease, which gave Mr. Smith a right of first refusal to purchase the property.
Mr. Smith continued to make lease payments to Work Enterprises at its office in Milton, Florida through October of 1994. Mr. Smith received a letter dated October 5, 1994, from Mr. Mabie informing him that Mr. Mabie was "tak[ing] over ownership of the warehouse," and that Mr. Smith should pay all future lease payments to him.[2] The letter invited Mr. Smith to call Mr. Mabie or Mr. Urquhart if he had any questions. Mr. Smith, who had no desire for further dealings with Mr. Urquhart,[3] arranged to meet Mr. Mabie on November 17, 1994.
At that meeting, Mr. Smith testified, Mr. Mabie specifically stated that he had sold the property to Mr. Urquhart. When Mr. Smith expressed an interest in buying the property, Mr. Mabie inquired, "What did Joe [Urquhart] say?" Mr. Smith told him Mr. Urquhart had first quoted a price of $170,000, then of $190,00, and finally of $240,000. Mr. Mabie then agreed to a lease[4] with an option to purchase for $240,000.
Charles Hoffman, a real estate attorney who testified as an expert below, explained that, while it is common and customary for a contract to provide that a deed will not be delivered until certain conditions are met, it is unusual for a deed to be delivered with the understanding that conditions will have to be met before delivery is *800 effective. The evidence does not support the finding that such an unusual transaction took place here.
The Mabie estate called the only surviving witness to the deed's delivery, Joe Elliott, who testified to the putative condition on which delivery of the deed was contingent:
Question: Was it your understanding that the thing that was held up was that he would deliver this deed to Mr. Urquhart, and he is to hold up on recording that deed until he had cleared Mr. Mabie's name off of that?
Answer: Yes, all conditions were made.
Question: Well, was there any condition other than paying off the mortgage? Wasn't that the only condition?
Answer: The only one I knew of, yes, sir.
Question: And you don't know what the time frame was?
Answer: No, sir.
Question: You don't know if that was to pay it off in six months, a year? You don't know that, do you?
Answer: No, sir.
Question: Let me ask you this: ... deed reads this way: "This conveyance is subject to a mortgage from Lefferts L. Mabie, Jr. to Peoples First Financial Savings & Loan Association recorded in a certain book and page of the records." And it says, "which mortgageewhich mortgage the grantees hereby expressly assume and agree to pay."
Now, if that language is interpreted to mean that they would just pay it as it comes due, okay, and let's say the length of mortgage was ten years, Mr. Elliott, was it your understanding that when the mortgageeor excuse me, the grantee, Work Enterprises, paid that mortgage off, then they would record the deed?
Answer: Yes, sir.
Question: That would be consistent with your understanding of the arrangement, correct, sir?
Answer: Yes, sir.
Mr. Elliott later testified further, still on cross examination, as follows:
Question: And I want to make sure that I understand this. This, I think, will be my last point or question. Based on what you heard at that meeting, what you understood the arrangements to be, the original deed was given to Mr. Urquhart and the understanding was as follows: Mr. Urquhart or his company, Work, was going to pay off the mortgage, some indefinite time, and when that occurred, he could record the deed?
Answer: Yes, sir.
Question: And if it took him some period of time, two years, five years, or whatever it took and then he paid off the mortgage, the deed could be recorded and it would be in all respects, public records and otherwise, the property of the grantee, correct?
Answer: I'm sure if all conditions were met between him and Mr. Mabie, yes, sir.
Question: And the conditionthe only condition that you've told us about that you're aware of is paying the mortgage, correct?
Answer: That's correct.
The fact that a grantee undertakes to pay off indebtedness secured by a mortgage encumbering real property does not render the grantor's delivery of the deed to the property conditional.
The only witness testifying to any condition identified what can only be described as a condition on recording the deed. Delivery *801 of the deed was unconditional. Accordingly, I would reverse and remand for further proceedings.
NOTES
[1] On August 5, 1993, however, while Work was still making payments on the assumed first mortgage, Mr. Mabie purported to mortgage the property a second time: In exchange for a loan in the amount of $150,828.15 from Allen Levin, Mr. Mabie and his wife Marianne signed and delivered a promissory note in favor of Mr. Levin, secured by a mortgage dated August 5, 1993, purporting to grant a security interest in the warehouse property, as well as various properties Mr. Mabie owned. Only after Mr. Mabie sent a letter "tak[ing] over ownership of the warehouse," did Work stop making payments to Peoples First on the assumed mortgage.
[2] On his 1994 income tax returns, Mr. Mabie listed the warehouse property as "[re]acquired" on October 1, 1994, at a price of $115,966, which was very close to (about $2,500 less than) the balance remaining due on the first mortgage at that time. Work's monthly payments on the mortgage had paid the principal down from $127,492, to $118,437. Work had also paid the interest, insurance, taxes, maintenance and repairs.
[3] Mr. Smith testified, he called Mr. Urquhart "a sorry snake," "a crook," "a liar," and "sorry as they come." Mr. Smith said he would like to deal with someone other than Mr. Urquhart, and Mr. Urquhart reportedly told Mr. Smith, "You're not dealing with me no more."

When Mr. Smith arranged the original lease with Work, Betty Sue Villar quoted a monthly rental of $1,700. But, when Mr. Smith arrived to sign the lease, Mr. Urquhart told Mr. Smith the rental would be $1,700 plus the monthly premium for hazard insurance on the property, rental sales tax, and ad valorem taxes, totaling $2,063.
During the term of the first lease, Mr. Smith communicated with Ms. Villar regarding an extension of the lease. She told him Work Enterprises would be glad to extend his lease at the same rental rate because he had proven to be a good tenant. When the time came to renew the lease, however, Mr. Urquhart again handled the transaction for Work. Despite what Ms. Villar had told Mr. Smith, Mr. Urquhart informed him that the rent would increase to $2,000 per month, plus the "triple net" charges (insurance premiums, sales tax, and ad valorem taxes) totaling $2,408.57 per month.
[4] A five-year lease dated December 21, 1994, bears Mr. Mabie's signature as the lessor, and Mr. Smith's signature as the lessee. But Mr. Smith testified he believed Mr. Mabie was dealing as "a peacemaker," to receive the rental payments and "come between" Mr. Smith and Mr. Urquhart. After Mr. Mabie started receiving the lease payments from Mr. Smith, in November of 1994, Mr. Mabie made the mortgage payments to Peoples First Financial Savings & Loan Association, but he did not pay the ad valorem taxes on the property for the years 1994 or 1995. He died in March of 1996.